[Civ. No. 4616. Third Appellate District.—November 29, 1932.]

MADERA SUGAR PINE COMPANY (a Corporation), Respondent, v. J. E. WEAKLEY et al., Defendants; M. D. RICCI, Appellant.

Carl E. Lindsay and Lindsay & Gearhart for Appellant.

Conley, Conley & Conley for Respondent.

PULLEN, P. J.—This action was brought upon the common counts to recover the value of box shook and materials

sold and delivered by Madera Sugar Pine Company to J. E. Weakley and M. D. Ricci, an individual doing business under the name of Ricci Fruit Company.

The defendant J. E. Weakley failed to appear and his default was entered, but M. D. Ricci answered and upon the issue so raised the court, sitting without a jury, found that defendant Ricci had a financial interest in the transaction hereinafter detailed, and was liable thereon with Weakley, and judgment was entered accordingly. Ricci appeals from the judgment so entered, contending that the evidence does not support the findings and that appellant was not liable for the unpaid balance.

The plaintiff, Madera Sugar Pine Company, was a corporation engaged in the manufacturing and sale of lumber and box shook, and M. D. Ricci had been for many years engaged in the shipping of fruit and grapes under the name of Ricci Fruit Company, with his principal place of business in the city of Madera. J. E. Weakley was a grower and packer of grapes produced from his own vineyard and shipped on consignment to eastern markets through the Ricci Fruit Company.

It appears from the transcript that Weakley was preparing to harvest his grapes and was in need of containers in which to pack his crop, and upon the suggestion of Ricci, a Mr. Froom, a sales representative of the Madera Sugar Pine Company, called upon defendant Weakley at his ranch and at the house of Ricci, and finally consummated the sale of box shook needed for the shipment of his grapes to market, and upon which was stenciled the name of J. E. Weakley as the grower and shipper, and his brand or label affixed.

It also appears that M. D. Ricci had been for several years a customer of the box company and was during the time of the delivery of shook to fill the order for the Weakley grapes, buying supplies for his individual account. All of the materials here in question were delivered to the Weakley ranch and were entered upon the order sheets "Ricci Fruit Co—J. E. Weakley Brand", and on the ledger sheets were so charged to Ricci Fruit Company. In the statements sent to Ricci the items were segregated at the request of Ricci and entitled "shook delivered to Ricci Fruit Company for J. E. Weakley".

Nothing was paid by Ricci on the Weakley account except the sum of $300 on account of the September statement, which payment was, according to the testimony of Ricci and his daughter, who acted as his bookkeeper, paid by mistake, but respondent claims that no claim of mistake was made to them until some time after the payment and that no claim for adjustment by way of credit on later bills was ever made by Ricci of them.

█ The foregoing represents substantially the undisputed facts in the case. As pointed out by Mr. Justice Sloss in the case of *Bancroft-Whitney Co.* v. *McHugh*, 166 Cal. 140 [134 Pac. 1157, 1158], where the sufficiency of the evidence to support the judgment is challenged, "an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding". All that is required here is to point out the testimony, which, if given credence by the trial court, would logically lead to the conclusion that the obligation was that of Ricci.

Under this well-known and long-recognized rule, an examination of the record finds ample evidence to support the finding.

Mr. Froom testified, in referring to the meeting between Weakley, Ricci and himself, at the home of Ricci:

"Q. What happened at that meeting? A. Well, we discussed the grapes and the shook, and the price of the shook, and so on, and what kind of boxes he was going to use. Q. Well, who selected the boxes? A. . . . both decided what boxes, and what transactions happened between the two of them afterwards, I do not know, but at that conversation, Mr. Ricci asked me to furnish him with some sample boxes, at his house, and if I am not mistaken, took four different kind of boxes over there, there is a good many different kind of lugs, for shipping grapes, but my recollection is I furnished four different samples, and they decided what to use. Q. When was it Ricci told you to charge this shook to him? A. It was during one of these meetings at his house, I cannot say which meeting it was,

but it was at his house, where he first mentioned to charge the shook to the Ricci Fruit Company.''

In another portion of his testimony he said:

''A. I brought some samples of the boxes over to Mr. Ricci's house, and Mr. Weakley was present at that time, and we got to talking about it, so Ricci made the remark about, he was going to handle his grapes, that is ship them for him, or help him to sell them, that he understood the business better than Weakley did, and that he did not consider Weakley a good grape shipper, or seller, as good as he was, and he wanted to know about the shook prices, and so on, and I gave him the prices on the different kinds of box shook, and then Ricci says, 'Well,' he says, 'I am going to have the shooks all charged to me, I am going to handle his grapes, load them, and charge it through to my account,' because, he says, 'I realize, I do not believe that Mr. Weakley's credit would be good with the Sugar Pine Company,' and I told him, absolutely, I did not think it would, and so, he says, 'that is all right'.''

On another occasion the witness related a conversation with Mr. Ricci about stopping the furnishing of shook to Weakley: ''A. . . . Mr. Ricci came out there in the morning, and he said, 'The market has gone to pieces', and he says, 'I am getting afraid,' he says, 'do not let Weakley have any more shook on my account', and I told him 'all right, we would stop it right now',''  and he continuing: ''. . . so in an hour or so, probably an hour or so, or maybe more, here comes Mr. Ricci again, and he says, 'All right, Mr. Lee and Mr. Froom' he always called me 'Pete', and called him 'George', he says, 'All right, let Mr. Weakley have the boxes, and charge my account, as before,' and that was as near as I can remember the conversation. Q. And did you furnish the shook to Weakley, after that conversation, the same as you had before? A. Yes, sir, and charged it the same as we did before.''

This testimony was corroborated by George Lee, an employee of the company, who told of the meeting with Mr. Ricci, wherein he directed that the shook be charged to him, and, also, related the instance of when he directed that no further deliveries be made to Mr. Weakley, and later countermanded the order.

There was other testimony by Mr. Froom and Mr. Lee during the trial which, if given credence by the trial court, placed the obligation of payment upon Mr. Ricci, but we believe the foregoing excerpts are sufficient to sustain the finding complained of.

Appellant, in urging his legal objections to the judgment, discusses at length the applicability of the statute of frauds, but in view of the finding by the trial court that Ricci was liable as an original promisor, and that the debt from its inception was an obligation of Ricci, the question of the statute of frauds does not apply. Whether or not a promise is original or collateral is a question of fact. (*Harris* v. *Frank*, 81 Cal. 289 [22 Pac. 856].) Respondent cites the case of *Merz* v. *Poole*, 82 Cal. App. 15 [254 Pac. 914], where a defendant had agreed to pay for tires furnished to a third party. The testimony was that the defendant stated to the dealer: "Go ahead, put the tires on, Charlie, and I will pay for them all right, put them on." In that case, the court held that defendant's promise was an original obligation on his part to pay for the tires and made him the principal debtor. In *Jan Wai* v. *Smith-Riddell Co.*, 55 Cal. App. 59–65 [202 Pac. 952, 955], the court said:

"The oral agreement to pay for the meat delivered to Tominaga is not within the statute of frauds. The complaint and the evidence show an original promise on the part of the defendant. 'If the goods are delivered by the seller to one person on the promise of another to pay for them and solely on the promisor's credit, the promise is original and not within the statute.'" (25 R. C. L. 448.)

Appellant also contends that the joining of Weakley as a party defendant is some evidence that respondent did not look to appellant as being the original promisor, but we cannot attach that construction to the act, nor is the fact that respondent accepted $500 from Weakley for the release from attachment of certain real property, anything of which appellant may complain. He has, at least, received a credit for that amount upon the balance due. And even if erroneous, and as to that we express no opinion, it is still an advantage to appellant of which he cannot complain. (*Kennedy-Shaw Lumber Co.* v. *Priet*, 113 Cal. 291 [45 Pac. 336].)

We find no merit in appellant's contention that the judgment finds no support in the evidence and the same is affirmed.

Thompson (R. L.), J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 29, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 26, 1933.